EXAMINATION UNDER OATH OF ALEXANDER MATTHEWS
CONDUCTED ON WEDNESDAY, MARCH 23, 2005

1 (Pages 1 to 4)

---

Page 1

INSURED: Ezana Corp.
CLAIM NO: 03ATR049-0475
DATE OF LOSS: 12/09/04
POLICY NO: 0475/ATR049

EXAMINATION UNDER OATH OF EZANA CORPORATION
by and through its Corporate Designee
ALEXANDER MATTHEWS
Fairfax, Virginia
Wednesday, March 23, 2005
10:28 a.m.

ORIGINAL

Job No.: 1-53374
Pages: 1 - 138
Reported by: Michelle L. Lonas, RPR, CCR

---

Page 2

Examination Under Oath of EZANA CORPORATION, by and through its corporate designee, ALEXANDER MATTHEWS, held at the law offices of:

STAHL, FOREST & ZELLOE P.C.
11350 Random Hills Road
Suite 700
Fairfax, VA 22030
(703) 691-4940

Pursuant to agreement, before Michelle L. Lonas, Registered Professional Reporter, Certified Court Reporter, and Notary Public of the Commonwealth of Virginia.

---

Page 3

APPEARANCES

ON BEHALF OF THE INSURER:
JEFFREY A. WOTHERS, ESQUIRE
NILES, BARTON & WILMER, LLP
111 S. Calvert Street
Suite 1400
Baltimore, MD 21202
(410) 783-6300

ON BEHALF OF THE INSURED:
JAMES T. ZELLOE, ESQUIRE
STAHL, FOREST & ZELLOE P.C.
11350 Random Hills Road
Suite 700
Fairfax, VA 22030
(703) 691-4940

ALSO PRESENT: Zachary Karrakchou

---

Page 4

CONTENTS

| WITNESS | PAGE |
|---|---|
| ALEXANDER MATTHEWS | |
| By Mr. Wothers | 15 |

EXHIBITS
(Retained by Mr. Wothers)

| DEPOSITION EXHIBIT NO. | | PAGE |
|---|---|---|
| 1 | Letter of March 21, 2005, from Wothers to Zelloe | 14 |
| 2 | ACORD Insurance Application, 6/24/04 | 52 |
| 3 | Endorsement Dated 6/28/04 | 64 |
| 4 | Proposal to Kibra Construction From D+1 Construction, 12/28/04 | 81 |
| 5 | Building Post Card Permit Request Form, 9/8/04 | 81 |
| 6 | Drawing | 99 |

---

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

EXHIBIT A

EXAMINATION UNDER OATH OF ALEXANDER MATTHEWS
CONDUCTED ON WEDNESDAY, MARCH 23, 2005

13 (Pages 49 to 52)

Page 49

1  Q  So basically, any obligations you had
2  related to the property were forgiven at that point.
3  A  Exactly.
4  Q  Was any money required to be paid to the
5  contract purchaser?
6  A  Huh-uh.
7    MR. ZELLOE: No.
8    THE WITNESS: No. He --
9    MR. WOTHERS: Okay.
10 BY MR. WOTHERS:
11 Q  I'm sorry. Go ahead.
12 A  That was nothing.
13 Q  How was it that he was willing to just
14 cancel the contract date?
15 A  He wasn't exactly willing to cancel. He
16 broke the settlement date. He was not able to --
17 about four days before closing, he called and said his
18 bank had a problem with the appraisal. I think his
19 bank was Industrial Bank of Washington. And he -- he
20 actually called, called us and asked us if we could
21 assist him with trying to get financing. But he --
22 he -- it wasn't initially canceled on our behalf. It

Page 50

1  was canceled because he couldn't come through in the
2  time frame of the contract.
3    MR. WOTHERS: Okay. And so he --
4    MR. ZELLOE: Yeah, he was looking for
5  financ -- he couldn't come up with all the financing,
6  and he wanted us to help out, and it was an
7  opportunity to get out of the contract.
8    MR. WOTHERS: Okay.
9    MR. ZELLOE: And so we used that. And so
10 then in exchange for us calling him under time is of
11 the essence for settlement, he couldn't produce on
12 that day. We told him to release it. And he agreed
13 to release it so that we just went our separate ways.
14 Because my clients wanted the property. And they
15 wanted -- it was basically a gift from God. They
16 got -- they were able to get out that way and keep the
17 property.
18    MR. WOTHERS: Wonderful. And you-all
19 walked away from that contract of sale as of what
20 date?
21    MR. ZELLOE: Shortly thereafter, he signed
22 the release.

Page 51

1    THE WITNESS: I don't remember the exact
2  date.
3    MR. ZELLOE: It was sometime in January,
4  beginning of January. Probably the first or second
5  week of January he signed the release.
6    MR. WOTHERS: Wonderful. Okay.
7  BY MR. WOTHERS:
8  Q  In terms of a chronology now, is there
9  anything else that you can think of in terms of
10 general steps that brought us to where we are today
11 that I haven't already asked you about, or you haven't
12 already told me?
13 A  No, sir.
14 Q  Okay. Let me go to the insurance
15 application. How did -- or strike that.
16   Who filled out the insurance application
17 concerning your policy with Lloyds?
18 A  I don't remember. I don't remember.
19 Q  Do you know if you gave the information to
20 the agent?
21 A  I talked to Sam. I believe his name was
22 Sam Bekele, or whatever his name is, the originating

Page 52

1  insurance agent who represents your client, or who
2  sells -- who sold us the policy on behalf of your
3  client. I had a conversation with him over the phone,
4  and I gave him, to the best of my knowledge, the stuff
5  that I had.
6    MR. WOTHERS: Okay. Let me mark this as an
7  exhibit so the record is clear. This will be -- we'll
8  make it number two, since we don't have anything else
9  right now.
10   (Exhibit No. 2 was marked for
11 identification and retained by Mr. Wothers.)
12 BY MR. WOTHERS:
13 Q  This is stapled together. It's -- it's six
14 pages. I don't know if it all originally came as six
15 pages. It's just -- it's how I got it. So let me
16 just show it to you. I want to ask you to just look
17 at the information on there, and take your time. And
18 Mr. Zelloe, if you want to look at it too.
19    MR. ZELLOE: Okay. I'd like to.
20    MR. WOTHERS: That's fine.
21 BY MR. WOTHERS:
22 Q  I want to verify the accuracy of as much of

EXAMINATION UNDER OATH OF ALEXANDER MATTHEWS
CONDUCTED ON WEDNESDAY, MARCH 23, 2005

14 (Pages 53 to 56)

**Page 53**

1  it as I can. A lot of it is forms that there really
2  isn't any information on.
3     A   There's nothing on it.
4     Q   It's not quite as daunting as it looks.
5     MR. ZELLOE: Let me take a look at it,
6  please.
7     MR. WOTHERS: Take your time.
8     (Discussion held off the record,
9  11:28 a.m.)
10    MR. ZELLOE: Are there two or three
11 buildings?
12    THE WITNESS: Three.
13    MR. ZELLOE: Okay.
14 BY MR. WOTHERS:
15    Q   Have you ever seen this Exhibit 2 before?
16    A   No, sir.
17    Q   Okay. And it doesn't appear to me to
18 contain your signature. Did you see your signature
19 anywhere on that?
20    A   No, sir.
21    Q   Okay. It lists the effective date as June
22 24th, 2004. Is that when you purchased the property?

**Page 54**

1     A   Approximately. I mean, I don't remember
2  exactly.
3     Q   We probably have a closing -- do we have a
4  closing date?
5     MR. ZELLOE: This has a settlement date of
6  6/17/04. I don't know if it closed on that date, but
7  that's the date of the settlement. Because it says
8  here adjusted 6/22/04. I think it took a little bit
9  of time. I didn't do the closing.
10 BY MR. WOTHERS:
11    Q   Okay. Now, in terms of buildings, it lists
12 premises number one and it says street address, 5005
13 D Street. But I'm not sure it references -- well,
14 strike that.
15    When you go to the third page of this, it
16 shows two buildings. I highlighted them here. It
17 says building one and building two. But I don't see a
18 reference to a third. Is it --
19    A   For legal purposes, I think in the D.C. tax
20 records and so on and so forth, the building is known
21 as 5005 -- the complex is known as 5005 D Street,
22 because it is one complex.

**Page 55**

1     Q   Okay. It's one complex comprised of two or
2  three buildings?
3     A   Three adjoined. They aren't separate.
4     Q   They're not separate.
5     A   No.
6     Q   Okay. And how many apartments are in these
7  buildings?
8     A   Twenty-seven.
9     Q   Twenty-seven.
10    And when you purchased the property, how
11 many were occupied?
12    A   I don't remember exactly. A couple of
13 them.
14    Q   Just a couple?
15    A   Yes.
16    Q   Most were vacant?
17    A   Yes.
18    MR. ZELLOE: These documents will show the
19 list.
20    MR. WOTHERS: Okay.
21    MR. ZELLOE: In this document, there's a
22 complete list of the rent roll and the people that

**Page 56**

1  were in there.
2     MR. WOTHERS: Okay. This document being
3  the sales?
4     MR. ZELLOE: All the -- the whole package
5  of closing documents. It has it all in there.
6  BY MR. WOTHERS:
7     Q   Now, it lists on the application under
8  additional interests, it says first trust $650,000.
9  That's the right amount, isn't it?
10    A   Yes.
11    Q   And it lists SFC, LLC.
12    A   Right.
13    Q   And who was that?
14    A   That's Springfield Financial Corporation
15 Arthur Thomas is the president of it. He was the
16 lender.
17    Q   Okay.
18    A   He's known as an SFC, LLC.
19    Q   Is he an individual, or is it a bank?
20    A   It's a corporation, I think, he and his
21 family own.
22    MR. ZELLOE: It's an LLC. He's a private

EXAMINATION UNDER OATH OF ALEXANDER MATTHEWS
CONDUCTED ON WEDNESDAY, MARCH 23, 2005

15 (Pages 57 to 60)

---

Page 57

1  lender.
2      MR. WOTHERS: Okay.
3  BY MR. WOTHERS:
4      Q   And then it shows a second trust of
5  $120,000, and that's Christopher --
6      A   Rinolsdale. (Phonetically) He was the
7  seller.
8      Q   He was the seller. So that was the take
9  back.
10     MR. ZELLOE: Right.
11     THE WITNESS: Probably.
12 BY MR. WOTHERS:
13     Q   Now, this says under a description, I'm
14 looking at page two, and it says three contiguous
15 apartment buildings masonry built in 1940, so on and
16 so forth, of which 22 are rented and five vacant.
17     A   I think he got that -- I think Samuel
18 Bekele transposed that. You know what I mean?
19     Q   You believe the numbers should go the other
20 way?
21     A   Right.
22     Q   If anything, it might be five rented and 22

Page 58

1  vacant?
2      A   Right.
3      MR. ZELLOE: Or -- well -- yeah, there
4  wasn't 22 rented. It was less than that. I think it
5  was either five or more than that that was occupied.
6  The exact amount, like I said, I have it here in the
7  rent rolls, because that was all being contended in
8  terms of who was in, you know --
9      MR. WOTHERS: That became an issue?
10     MR. ZELLOE: I don't know if you've ever
11 dealt with having to get rid of people for nonpayment
12 and everything in D.C.
13     MR. WOTHERS: I have not.
14     MR. ZELLOE: It is -- it's a very long
15 process, especially when you're dealing with people --
16 when you're dealing with Section 8, and you're dealing
17 with -- down in Southeast and Southwest.
18     MR. WOTHERS: Well, this became an issue, I
19 imagine, when they were telling you to house people
20 and you got suddenly 40 people showing up, and you're
21 saying --
22     MR. ZELLOE: Oh, neighbors were showing up,

Page 59

1  everybody was just showing up and saying, Me too.
2      MR. WOTHERS: Right.
3      MR. ZELLOE: But it became an issue with
4  the lawsuits.
5      MR. WOTHERS: Okay.
6      MR. ZELLOE: But in terms of I resolved all
7  of that. Just because there's an eviction notice, you
8  have a right -- where in Virginia you have self-help
9  remedies. And if I get a pay or quit, and they quit,
10 I can use self-help remedies and take them out. I can
11 do it myself. I can lock the door and everything.
12     MR. WOTHERS: But you cannot do it in D.C.
13     MR. ZELLOE: You cannot do it in D.C. You
14 have to use the U.S. Marshal service. And if the U.S.
15 Marshal service is busy --
16     MR. WOTHERS: You wait.
17     MR. ZELLOE: Yeah. And you can wait
18 six months. You can wait a year. Or they -- if they
19 decide they don't want to come on over there, you can
20 wait au infinitum. So it's -- it's a different ball
21 game than in most jurisdictions.
22     MR. WOTHERS: Bear with me just a minute.

Page 60

1  I'm trying to skip through a lot of this, but I want
2  to make sure I cover what I need to.
3      (Pause)
4      THE WITNESS: Pardon me, if I can ask,
5  how -- approximately how long are we going to be here
6  today, because I --
7      MR. WOTHERS: I would say probably 30 or
8  40 minutes, because I haven't gotten to the vandalism
9  yet.
10     THE WITNESS: Okay.
11     MR. WOTHERS: Do you need to call somebody
12 or --
13     THE WITNESS: No. I just -- I need to go
14 in about a half hour or so.
15     MR. WOTHERS: Okay. I'll move as quickly
16 as I can for you.
17 BY MR. WOTHERS:
18     Q   The applicant is referenced on here as
19 Ezana Corporation. It doesn't seem to reference Mekki
20 at all.
21     A   The actual Certificate of Insurance -- and
22 again, I guess this would go back to something that

EXAMINATION UNDER OATH OF ALEXANDER MATTHEWS
CONDUCTED ON WEDNESDAY, MARCH 23, 2005

16 (Pages 61 to 64)

61

1  maybe Sam was not clear, but the actual certificate of
2  insurance was made out to Ezana Corporation and Abid
3  Karrakchou, who is the president of Mekki, LLC, but --
4  so he -- he was on the policy.
5      Q   He was individually.
6      A   Well, it was supposed to be Mekki, LLC.
7  But I guess they put -- I put myself and Ezana Corp.,
8  and I put Mekki, LLC, and Abid Karrakchou.
9      Q   Did you write that down somewhere for the
10 agent?
11     A   I went to Sam's office, and I sat and he
12 typed.
13     Q   Did you get a copy of what he typed out?
14     A   No. Because he had -- I had to sit, and he
15 typed, and I paid. And then he said, Okay, I'm going
16 to -- I'll forward this, and once we have it, I'll fax
17 a copy of it to Eli Hurwitz over at, over at the
18 title --
19         MR. ZELLOE: He was the settlement
20 attorney.
21         THE WITNESS: -- place.
22

62

1  BY MR. WOTHERS:
2      Q   Did you, at any time prior to the
3  vandalism, get a copy of your declarations page or of
4  your policy?
5      A   I may have.
6      Q   Did you -- did you notice at any point in
7  time that Mekki was not listed?
8      A   No, I didn't look at it and see what -- if
9  I saw it.
10     Q   There was a change -- let me see if I can
11 find it. I'll show it to you -- endorsement to the
12 policy, endorsement number one, and it asks that the
13 policy, the insured, the named insured on the policy
14 to be changed to be Ezana and Abid Karrakchou. Do you
15 know how this endorsement came into being?
16     A   Why would that be necessary if, if that was
17 the original designation as per -- I mean, if it was
18 anything, it should have been changed from that to
19 Ezana Corporation and Mekki, LLC.
20     Q   Right.
21     A   So why do we have to amend what's already
22 there?

63

1      Q   Right. That's what I'm not clear on.
2          MR. ZELLOE: You can -- just remember, you
3  can only -- don't speculate. You can only talk about
4  what you know.
5          THE WITNESS: Okay. Yeah.
6          MR. ZELLOE: I mean, if you think that Sam
7  did something or didn't do something, that's something
8  that they have to talk about with Sam. But in terms
9  of -- was there -- if I can just ask you, was there
10 ever another endorsement that put Mekki on?
11         MR. WOTHERS: Not that I saw.
12         MR. ZELLOE: Because I asked. I asked for
13 it when I saw all this, and I said, Mekki needs to be
14 on this endorsement. And I left messages for this
15 individual over at the insurance company.
16         MR. WOTHERS: The agent's office?
17         MR. ZELLOE: Yes, the agent's office, to
18 please list Mekki. And I can't remember -- I can't
19 remember specifically if I did speak to him.
20         MR. WOTHERS: To the agent?
21         MR. ZELLOE: I believe I did, but I can't
22 for 100 percent positive say that I spoke to him in

64

1  person, but I know I've left messages.
2          MR. WOTHERS: Was that before the vandalism
3  or after?
4          MR. ZELLOE: This was -- it was after. It
5  was after. Because I was also working on, with trying
6  to obtain financing, and I was putting all the
7  documents in a row and looking at them all, and I
8  said, Mekki needs to be listed onto this insurance
9  policy. And I guess we never have it, because I see
10 now there's been a notice of cancellation.
11         MR. WOTHERS: Has there? I didn't realize
12 that.
13         MR. ZELLOE: The second trust holder
14 notified me, that they're canceling this policy as of
15 4/5, April 5th.
16         MR. WOTHERS: Let me do this. Let me mark
17 this endorsement as Exhibit 3 so at least it will be
18 part of this record, too.
19         (Exhibit No. 3 was marked for
20 identification and attached to the transcript.)
21         MR. WOTHERS: And one of the things that
22 I'll try to find out is are there other endorsements?

Page 81

1    MR. WOTHERS: Sure. Do you have an extra
2  copy?
3    MR. ZELLOE: No. I'll make you copies of
4  all this stuff. Let me make them right now so you can
5  put them as exhibits.
6    MR. WOTHERS: Sure. That would be good.
7    (Recess taken, 11:57 a.m. to 11:59 a.m.)
8    (Exhibits Nos. 4 and 5 were marked for
9  identification and retained by Mr. Wothers.)
10   MR. WOTHERS: All right. Back on the
11 record.
12 BY MR. WOTHERS:
13   Q   Let me show you what we've marked as
14 Exhibit 4, and ask if you can tell, tell me what that
15 is.
16   A   That is -- that is a contract with Ed
17 Denson for all the, all the work that was done on the
18 property after the incident occurred, and included the
19 demolition, dumpsters, bulldozers and so on.
20   Q   Sort of emergency repairs right after?
21   A   Right.
22   Q   Okay. And then let me show you what I've

Page 82

1  marked as Exhibit 5, something we've been talking
2  about. If you could just identify that for the
3  record, please.
4    A   That's a copy of the broad permit request,
5  request form that led to the issuance of the three
6  Post Card Permits to clean up the building.
7    Q   And that's the date. What is the date on
8  Exhibit 5?
9    A   9/8/04.
10   Q   Were the Post Card Permits dated the same
11 day?
12   A   Well, actually, the post card permits
13 aren't dated. So yeah, I guess -- that -- the
14 reference number there, I guess, that was applied to
15 these, they would be in effect that day, yes.
16   MR. WOTHERS: Okay. The lawsuit that you
17 mentioned, Mr. Zelloe, is -- do you have any idea how
18 much money was paid? Did you-all pay any money to
19 settle any of those?
20   MR. ZELLOE: Yes.
21   MR. WOTHERS: Do you have any idea how much
22 that was?

Page 83

1    MR. ZELLOE: Yeah. Give me one minute and
2  I'll give you the exact amount. Let me go find that
3  exactly.
4    MR. WOTHERS: The other question I'm going
5  to ask is do you have a liability policy on this, or
6  is Lloyds' policy a liability policy as well as you
7  know?
8    MR. ZELLOE: It was a liability policy.
9  Lloyds was the whole policy.
10   THE WITNESS: That is the policy.
11   MR. WOTHERS: That's the only policy --
12   MR. ZELLOE: Yeah, that's the only policy
13 they had.
14   MR. WOTHERS: -- in place on this building.
15   MR. ZELLOE: Yeah. I'll tell you the exact
16 amount.
17   MR. WOTHERS: All right.
18   (Recess taken, 12:01 p.m. to 12:11 p.m.)
19   MR. WOTHERS: You want to put on the record
20 the cost for the lawsuit?
21   MR. ZELLOE: Yeah. We spent $60,000 to
22 settle the lawsuit.

Page 84

1    MR. WOTHERS: Is that the money that was
2  actually paid to these?
3    MR. ZELLOE: That was paid. That was paid
4  to the people that were in the building.
5    MR. WOTHERS: Does that include your time?
6    MR. ZELLOE: No.
7    MR. WOTHERS: And did you bill hourly for
8  your time on that?
9    MR. ZELLOE: Yes, I did.
10   MR. WOTHERS: So that would be something in
11 addition to the 60.
12   MR. ZELLOE: That was in addition to it.
13 Like I said, I haven't, as of today, seen a complete
14 copy of this policy, and I don't know if Terry McNulty
15 has one. Sam, the insurance agent, I don't get very
16 far with him in terms of getting things, and so I -- I
17 still, to this date, do not have a copy of the policy.
18 So I have no idea what I can make a claim under and
19 what I can't. I've been just dealing straight with
20 Mr. McNulty.
21 BY MR. WOTHERS:
22   Q   Okay. Let me ask just a few specific

85

1  questions I've been jotting down as we've been
2  speaking. One is, I think I've already gotten at
3  this. You told the agent, to the best of your
4  recollection, that you thought that there were
5  about -- well, I don't know if you said a number.
6  Just a few units that were rented. The vast majority
7  were not rented.
8      A    Yeah.
9      Q    When I showed you the information in what I
10 think is the application, you said you think he
11 transposed the numbers?
12     A    Uh-huh.
13     Q    It's better if you say yes or no.
14     A    Yes. I'm sorry. Yes.
15     Q    Did you tell the agent that you were going
16 to be renovating the property and converting it to
17 condominiums?
18     A    I don't remember exactly, exactly what I
19 told him.
20     Q    Do you know whether Mekki obtained an
21 insurance policy in their own name?
22     A    To the best of my knowledge, I don't think

86

1  that they did.
2          MR. ZELLOE: I don't believe they did.
3  BY MR. WOTHERS:
4      Q    If the damage occurred around October of
5  2004, when did you report it to the insurance company?
6      A    I didn't report it immediately. I have --
7  quite frankly, I've never been through an experience
8  like that in my life, and I didn't -- I didn't call
9  Zack, because he's not too -- you know, he doesn't
10 understand -- I don't think he would have been able to
11 do much as far as with me trying to deal with all
12 these agencies, and all -- and I reported -- I mean,
13 after -- finally, Jim came and saved us, because I
14 mean, he -- he stopped the loss from being much larger
15 than it possibly could have been, because this --
16 these lawyers from Arnold and Porter all of a sudden
17 started serving me like, I mean, it was crazy.
18         MR. ZELLOE: What happened was that when
19 this happened, Mr. Matthews was down there every day
20 working on this building, night and day, and he was
21 trying to take care of everything. And after a couple
22 weeks, maybe three weeks, three or four weeks, I

87

1  believe you were -- oh! Mr. Karrakchou found out
2  about the lawsuit when he got served, when his son was
3  here, and got served with the lawsuit. And said, What
4  is this? Send everything over to my office. And
5  that's the first thing I said is, Where's the
6  insurance policy? So that's why it was -- that's why
7  it was probably at least a month from the time period
8  in which -- when it was -- when it was reported to the
9  insurance company.
10 BY MR. WOTHERS:
11     Q    Do you know when it was reported to the
12 insurance company?
13     A    I called Sam over the phone.
14     Q    When was that?
15     A    I don't remember exactly. It wasn't that,
16 that --
17         MR. ZELLOE: Let me see if I could -- let
18 me see if I have a document. Hold on.
19         You can keep talking. Let me see if I have
20 a document, because I think we needed to sign
21 something at one point.
22         MR. WOTHERS: Yeah, if you can just tell me

88

1  what month it was, that would be useful.
2          (Mr. Zelloe exited the room, 12:15 p.m.)
3          THE WITNESS: That's -- Jim kind of saved
4  us, because they were trying to make -- the laws in
5  D.C. in regards to tenants and everything, and they
6  had hired this Arnold and Porter through a firm called
7  Bread for the City that's based over there in
8  Southeast. I guess they figured that we were folks
9  from Virginia with all this money, and they just
10 started going after it. I mean, it was -- so Jim
11 fortunately was able to bring things under control and
12 we, we reached a settlement in court. It was crazy.
13         MR. WOTHERS: Yeah.
14         THE WITNESS: I've never -- and then this
15 guy that called -- the D.C. -- the -- the guy that
16 Terry McNulty called to corroborate the report --
17         MR. WOTHERS: The detective?
18         THE WITNESS: Yeah, the detective. I
19 apologize. He required me to be down there every day
20 from sun up to sun down, because he said, Look, it's
21 your building, and you need to be here overseeing all
22 this stuff, and someone has to be here to make sure